**Case No. 25-60489**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**UNITED STATES OF AMERICA**,
Plaintiff-Appellee

v.

**KOREA McKAY,**
Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Mississippi
Cause No. 3:23-cr-68-MPM-RP

---

**PRINCIPAL BRIEF OF APPELLANT**
**KOREA MCCAY**

---

**GRAHAM P. CARNER**
Miss. Bar No. 101523
CARNER & ROSEMON, PLLC
401 E. Capitol Street, Suite 310 (39201)
P.O. Box 55644
Jackson, Miss. 39296-5644
601.427.8999
graham@carnerrosemon.com

**Attorney for Appellant**

# CERTIFICATE OF INTERESTED PERSONS

**No. 25-60489**

**UNITED STATES OF AMERICA**,
Plaintiff-Appellee

v.

**KOREA McKAY,**
Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Mississippi
Cause No. Cause No. 3:23-cr-68-MPM-RP

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

The Honorable Michael P. Mills,
*District Judge of the Northern District of Mississippi*
Korea McKay,
*Defendant-Appellant*
Graham P. Carner and Spencer Cash of Carner & Rosemon, PLLC,
*Appellate Counsel for Defendant-Appellant*
John Keith Perry, Jr. of Perry Griffin, P.C.,
*Trial Counsel for Defendant-Appellant*
Samuel Stringfellow and Julie Howell Addison of the United States Attorney's Office, Northern District of Mississippi,
*Trial and Appellate Counsel for Plaintiff-Appellee*

FEBRUARY 18, 2026,

*/s Graham P. Carner*
Graham P. Carner
*Attorney for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is warranted so that the parties and Court may fully explore whether this Court should reexamine its prior precedents upholding the use of the Commerce Clause as the jurisdictional basis for a criminal offense under 18 U.S.C. § 922(g)(1).

## TABLE OF CONTENTS

Certificate of Interested Persons ..................... i
Statement Regarding Oral Argument ..................... ii
Table of Contents ..................... iii
Table of Authorities ..................... iv
Jurisdictional Statement ..................... 1
Statement of Issues Presented for Review ..................... 2
Statement of the Case ..................... 3
A. Relevant Facts ..................... 3
B. Relevant Procedural History ..................... 13
Summary of the Argument ..................... 13
Standard of Review ..................... 14
Argument ..................... 15
I. The Commerce Clause Does Not Support Broad National Police Powers and Federal Jurisdiction Over McKay's Conduct ..................... 15
II. The Prosecution Made Improper Closing Arguments ..................... 26
Conclusion ..................... 32
Certificate of Service ..................... 33
Certificate of Compliance ..................... 34

# TABLE OF AUTHORITIES

## Cases

*Alderman v. United States*, 131 S. Ct. 700 (2011) .................................. 17, 18, 24
*Berger v. United States*, 295 U.S. 78 (1935) .................................................. 27, 28
*Jackson v. Virginia*, 443 U.S. 307 (1979)..............................................................29
*Molina-Martinez v. United States*, 578 U.S. 189 (2016)........................................26
*Puckett v. United States*, 556 U.S. 129 (2009) .......................................................15
*New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022)................23
*NFIB v. Sebelius*, 567 U.S. 519 (2012)..................................................................24
*Rehaif v. United States*, 588 U.S. 225 (2019) .........................................................12
*Scarborough v. United States*, 431 U.S. 563 (1977) ...................... 16, 17, 19, 20, 25
*Strickland v. Washington*, 466 U.S. 668 (1984) ....................................................32
*United States v. Alcantar*, 733 F.3d 143 (5th Cir. 2013) ......................................25
*United States v. Alderman*, 565 F.3d 641 (9th Cir. 2009) ......................................19
*United States v. Bonner*, 159 F.4th 338 (5th Cir. 2025) ......................................22
*United States v. Bowen*, 818 F.3d 179 (5th Cir. 2016)........................ 27, 29, 30, 31
*United States v. Ceballos*, 789 F.3d 607 (5th Cir. 2015)..................................27-30
*United States v. Hembree*, 2026 U.S. App.
LEXIS 2051 (5th Cir. Jan. 27, 2026) ............................................................ 22, 23
*United States v. Hill*, 927 F.3d 188 (4th Cir. 2019) ...................................... 19, 20
*United States v. Hitt*, 473 F.3d 146 (5th Cir. 2006)................................................30
*United States v. Kirk*, 1997 U.S. App. LEXIS 12670 (5th Cir. 1997)....................19
*United States v. Kuban*, 94 F.3d 971 (5th Cir. 1996) .................................... 17, 19
*United States v. Lopez*, 514 U.S. 549 (1995) ........................................... 16-20, 27
*United States v. Patton*, 451 F.3d 615 (10th Cir. 2006) .........................................19
*United States v. Rahimi*, 602 U.S. 680 (2024) .......................................................23
*United States v. Rawls*, 85 F.3d 240 (5th Cir. 1996) .............................................20
*United States v. Reagan*, 725 F.3d 471 (5th Cir. 2013) .........................................27
*United States v. Rodriguez-Lopez*, 756 F.3d 422 (5th Cir. 2014)...........................27
*United States v. Seekins*, 2022 U.S. App.
LEXIS 23746 (5th Cir. Aug. 24, 2022) ....................................................................15
*United States v. Seekins*, 52 F.4th 988 (5th Cir. 2022) ...................... 17, 21, 22, 25
*United States v. Sepulveda*, 64 F.4th 700 (5th Cir. 2023). ............................ 14, 31
*United States v. Thompson*, 482 F.3d 781 (5th Cir. 2007) .....................................28
*United States v. Toure*, 965 F.3d 393 (5th Cir. 2020) ............................................15
*United States v. Urbina-Fuentes*, 900 F.3d 687 (5th Cir. 2018) ...........................26
*United States v. Wilson*, 143 F.4th 647 (5th Cir. 2025).................................. 14, 31
*Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000) .........................................32

**Statutes**

18 U.S.C. § 922 ........ *passim*
18 U.S.C. § 1201 (repealed) ........ 16
18 U.S.C. § 3231 ........ 1
28 U.S.C. § 1291 ........ 1
28 U.S.C. § 2255 ........ 31

**Rules**

Fed. R. App. P. 28 ........ 1
Fed. R. Crim. P. 29 ........ 11, 12
Fed. R. Crim. P. 52 ........ 15

**Constitutions**

Art. 1, Section 8, Constitution of the United States ........ 15

## JURISDICTIONAL STATEMENT

*This statement is provided in accord with FRAP 28(a)(4)(A)-(D).*

The district court had jurisdiction under 18 U.S.C. § 3231. It entered final judgment on August 28, 2025. (Doc. 81). Mr. McKay filed his notice of appeal on September 10, 2025. (Doc. 83). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

There are two questions on appeal:

1. Should this Court reexamine its prior opinions upholding the use of the Commerce Clause as the jurisdictional basis for a criminal offense under 18 U.S.C. § 922(g)(1), when possession of ammunition does not substantially affect interstate commerce and the only proof of any effect on interstate commerce in this case was that one shell casing was manufactured at an unknown time in a state other than Mississippi?

2. Did the Government commit prosecutorial misconduct in closing argument when it argued facts not in evidence and committed other instances of improper argument?

## STATEMENT OF THE CASE

This appeal concerns the boundaries of federal police power under the Commerce Clause as well as the boundaries of closing arguments by prosecutors. Because the basis of federal jurisdiction over this offense is constitutionally infirm, Mr. McKay's conviction is due to be reversed and rendered. Alternatively, he is entitled to a new trial because of improper closing arguments by the prosecution, to which his trial counsel did not object.

### A. Relevant Facts

On February 18, 2023, Davao Thomas was shot and killed at the Kirby Estates Apartment Complex ("Kirby Estates") in Tunica, Mississippi. ROA.137. After a brief investigation, police focused on Korea McKay as a suspect and began searching for him. ROA.138. He turned himself in on or around February 22, 2023. ROA.310. He was charged with felon in possession of ammunition pursuant to 18 U.S.C. § 922(g)(1); he waived his arraignment and entered a plea of not guilty on May 26, 2023. ROA.12, 18. His trial began on March 24, 2025. ROA.121.

Jody Thomas, Davao's girlfriend, testified she lived in Kirby Estates with Mr. Thomas and her two daughters. ROA.150. On the day in question, she was "getting [her] hair done" in her apartment when she heard a truck "speeding" through the complex. ROA.151-52. Mr. Thomas told the driver to "slow that truck down" and started walking down the street. ROA.152. The truck parked nearby,

and Jody saw Jeffrey Pickett exit the truck. ROA.153. She put on her shoes and heard a "commotion" outside, so she exited her apartment when she "hear[d] three gunshots and [saw] him (Mr. Thomas) falling to the ground." ROA.152. She did not see the shooting occur. ROA.162.

She testified she had seen Mr. McKay drive the truck in the neighborhood. ROA.153-54. A couple of days later, Tunica County investigators provided Jody with a photo lineup. ROA.157. She chose Mr. McKay's photo and wrote underneath that "[t]his is the person that I always seen drive the truck" but on the day in question, she did not see the driver. ROA.159.

Jerrica Kinnel, Jody Thomas's daughter, was doing her mom's hair when "[a] truck came by. . . going fast." ROA.167. According to Kinnel, someone in the truck yelled at some kids to "[g]et [their] ass out the road." ROA.167. At that point, the truck parked nearby, and Jeffrey Pickett exited the passenger side of the truck carrying Family Dollar[1] bags. ROA.170, 174. Mr. Thomas and the driver began "going back and forth kind of yelling at each other." ROA.167. Soon after, Mr. Thomas "was walking up to shake [the driver's] hand" when "gunshots went off" and the truck sped away. ROA.170-71. Kinnel asked Pickett who was driving, and he responded that he did not know. ROA.170. She did not see the driver and only saw a "brown" hand holding a handgun out of the window. ROA.171-72.

[1] Throughout the trial, witnesses use "Family Dollar" and "Dollar Tree" interchangeably. For ease of reference, we use the term "Family Dollar" throughout the brief.

The following exchange occurred shortly thereafter:

Q. [Julie Addison, Assistant United States Attorney]:
I'll show you, Ms. Kinnel, what's been marked as Government's Exhibit 2 and admitted. Do you recognize this vehicle?
A. Yes, ma'am.
Q. And what is that?
A. It's the truck that was there.
Q. And who do you know to be the driver of that vehicle?
A. Mr. Korea.
Q. Do you know his last name?
A. McKay.
Q. The person that you know as being the driver of that truck, do you see him in the courtroom today?
A. **No, ma'am.**
Q. Okay. And, so, knowing that is Korea McKay, do you see that person in the courtroom today? And you can take your time.
A. Yes, ma'am.
Q. Okay. Can you describe what that person's wearing?
A. I really can't see; but I see, like, a white shirt.
Ms. Addison: Your Honor, can the record reflect that she's identified the defendant?
The Court: All right. Let it reflect.

ROA.174-75 (emphasis added). Kinnel testified she saw a firearm but could not recall what the gun looked like and did not see any shell casings nearby. ROA.184, 188-89.

Kevis Wilson also testified for the government. On February 18, 2023, Wilson got off work at around two o'clock in the afternoon and left for his apartment at Kirby Estates. ROA.207. He pulled into the complex and saw another truck near his parking spot, so he stopped and waited for that truck to move. ROA.207-08. While waiting, he was looking down at his phone when he heard

gunshots. ROA.208. He called 911 and began to follow the truck as it left the complex. ROA.208. He told the dispatcher that the police needed to stop the truck, but law enforcement ultimately did not. ROA.208.

Wilson testified that he knew of Mr. McKay but had never met him in person. ROA.214-15. He stated he did not see who was driving the truck that day, did not see a firearm and never saw any shell casings eject of out the truck window and/or any firearm. ROA.215-17. He agreed it was common to see shell casings in the Kirby Estates parking lot, as gunfire there was common. ROA.216-17.

Carol Womack, property manager for Kirby Estates, testified there are cameras situated around the front of the leasing office on site. ROA.221. A few days after the shooting, officers retrieved the video footage from the leasing office. ROA.223. She testified that she did not know McKay personally but had seen him at Kirby Estates visiting with his sister; however, she did not recognize the truck involved in the shooting. ROA.225-26. Mr. McKay's attorney showed Womack two resident-recorded phone videos from the day of the shooting, but Womack had never seen them. ROA.238.

Jessica Alexander testified that in her role as an investigator with the Tunica County Sheriff's Department, she is responsible for handling most felony cases. ROA.240. On February 18, 2023, she was on duty when a call came in that a shooting occurred at Kirby Estates. ROA.241. She had been to the complex "a

number of times" in response to shootings there. ROA.266-67. When she arrived on the scene, officers had already secured the scene and had "bagged" Mr. Thomas's hands. ROA.244, 246. However, she was not aware of any attempt to lift any gunshot residue from his hands. ROA.261. She also observed "two spent shell casings by [Mr. Thomas's] body," placed placards down as evidence markers and collected the shell casings. ROA.245, 248.

Alexander determined the shell casings beside Mr. Thomas's body came from a 9mm but could not definitively say he was shot by a 9mm. ROA.269. During her time on the scene, people were "reluctant" to speak to the police "but they didn't know who or what happened." ROA.252. However, at some point, she "develop[ed]" Korea McKay as "a suspect." ROA.253. Several days later, the police issued a BOLO alert for a tan Chevy truck as well as for Mr. McKay. ROA.254. Officers eventually found the truck without a license plate parked behind a trailer in Dundee, a small, unincorporated town in rural Tunica County. ROA.255.

Donald Davern, a 30-year veteran pharmacist turned Tunica County Investigator, arrived at the scene of the shooting after it had been secured. ROA.277. His role was to take pictures of the scene and collect the evidence. ROA.278. He learned that a brown pickup truck was at the center of the incident and that "[t]he suspect was Mr. McKay." ROA.279. Investigator Davern stated he

worked as a liaison between the sheriff's office and the casinos, so he reached out to Gold Strike, a local casino, to view their parking lot security videos. ROA.279. He "had a tag number of the vehicle"[2] and viewed Gold Strike surveillance footage and determined the truck had recently been on the premises. ROA.279-80. He stated that officers later received a tip that the suspect truck was abandoned on Alderson Road in Dundee. ROA.281. He went to that location, and officers transported the truck to an airport hangar to preserve potential evidence. ROA.284. He acknowledged there "are a number of shootings" at Kirby Estates. ROA.289.

Lieutenant Michael Smith's role in the investigation began with reaching out to local businesses to find video footage of the tan truck on the day of the shooting. ROA.292-93. He first obtained video surveillance from Family Dollar that showed Mr. McKay and Mr. Pickett exiting a brown truck and entering the store at around 2:30 p.m. and exiting a few minutes later. ROA. 293-94. Lieutenant Smith then obtained video footage from a nearby Wendy's which showed the truck "headed towards Kirby Estates" and located surveillance footage from Checkers which showed the vehicle "driving at a high rate of speed." ROA.301, 304. Lastly, he obtained video footage from Kirby Estates that showed the truck entering the apartment complex at 2:51 p.m. and leaving at 2:53 p.m. ROA.308. However,

---

[2] Davern did not specify how he got the tag number and only stated that he had it.

Lieutenant Smith did not see any live video of the incident and had only seen surveillance footage he obtained. ROA.311.

ATF Special Agent David Erhart testified as a firearms expert and nexus witness, and he served as the lead federal case agent in McKay's case. ROA.316. Agent Erhart stated that the shell casings found at the crime scene came from a 9mm. ROA.316. He "contact[ed] the manufacturer" and "was able to determine" the shell casings were manufactured outside of Mississippi.[3] ROA.318.

Agent Erhart then testified as a fact witness. He became involved in the case a couple of days after the shooting and began gathering evidence for the case. ROA.330. Agent Erhart learned that Mr. McKay was a suspect and that a truck was involved in the shooting. ROA.332-33. Like Lieutenant Smith's testimony, Agent Erhart watched the surveillance videos at Family Dollar and observed Mr. McKay and Mr. Pickett exit the truck prior to the shooting. ROA.336. He was aware that

[3] Defense counsel objected to this line of questioning and the attorneys had a sidebar discussion outside the hearing of the jury. Defense counsel stated he had not stipulated to the manufacturing origin and objected to the witness speaking in definite terms about where the shell casings were made. ROA.319. Specifically, defense counsel argued the witness could not make that determination based on his own expertise because that could only be done by the engineer that performed the test. The Court sustained the objection. Back in open court, the government asked the witness whether his expertise allowed him to "determine the origin of the manufacturer for" the shell casing. The witness then provided a detailed narrative of how he came to know the bullet was manufactured elsewhere that ended by opining that Winchester "manufactured it in East Alton, Illinois." ROA.320-22. The Court directed the attorneys to approach the bench, wherein the judge asked defense counsel whether the government had returned to the line of questioning to which he had previously objected, and defense counsel answered in the affirmative. ROA.323. In open court, the judge instructed the jury to disregard the witness's last opinion regarding the origin of the bullet being manufactured Illinois.

Mr. McKay eventually turned himself in as the suspect in Mr. Thomas's shooting and later bonded out. ROA.337-38.

Erhart "obtained a criminal complaint for Mr. McKay" on a separate charge and arrested him at Mr. McKay's grandmother's house. ROA.338. ATF agents searched the home and found two cellphones, one that belonged to Mr. McKay and another that belonged to Kara Price. ROA.338. Agent Erhart obtained a search warrant for historical cell site location information and provided those records to ATF Special Agent Mark Sonnendecker.[4] ROA.339-40. Both phones were associated with "WackMcKay2212@gmail.com" and one was subscribed to Terrell McKay. ROA.340. He testified to Google searches on the phones someone had searched about overcoming "video surveillance" and various legal questions. ROA.343-44.

Agent Erhart investigated the occupants of the trailer where officers found the truck in Dundee. He learned that the people that lived there, Tiffany Turner and Korey Turner, both knew Mr. McKay. ROA.345. Erhart said they learned the truck found in Dundee was registered to Mr. McKay. ROA.345. Agent Erhart acknowledged he did not perform a fingerprint analysis on the shell casings found at the scene and did not find a connection between the shell casings and Mr. McKay based on the NIBIN network. ROA.355.

---

[4] Agent Sonnendecker testified later in the trial. Thus, Agent Erhart's testimony after this point is based on the data Sonnendecker analyzed.

Special Agent Mark Sonnendecker testified as an expert in cell-site analysis and geolocation. ROA.389. He explained how phone companies store and maintain cell data, as well as the science behind geolocation. ROA.389-91. Based on the McKay's phone records, Agent Sonnendecker "reenacted" where McKay's seized phones had "pinged" around the time of the shooting by driving the route the phones' data presented. ROA.391-92, 96-97, 400-402. Agent Sonnendecker observed the phones were using cell towers near Family Dollar and Kirby Estates. ROA.403-08. He stated that on February 18, 2023, between 3-4pm, there was "a significant uptick in activity." ROA.412. Defense counsel did not cross examine Agent Sonnendecker.

The parties then stipulated that Mr. McKay had a prior felony conviction and that he was aware of that at the time of the alleged conduct. ROA.414-15. The Government asked the Court to take judicial notice that Tunica County is located in Northern District of Mississippi, and the Court did so. ROA.415.

The Government then rested. ROA.415. Defense counsel did not move for a judgment of acquittal pursuant to Rule 29 of the *Federal Rules of Criminal Procedure* after the Government rested.

Mr. McKay called Jerrica Kinnel in his case-in-chief. She had previously testified for the Government. ROA.423. Ms. Kinnel stated that while at the police station, she identified Mr. McKay as the person she knew to drive the truck but that

she did not see him on the scene the day of the shooting. ROA.429-30. Kinnel testified she saw a firearm that day, but her written statement to police stated she heard gunshots and then looked at the truck. ROA.431.

Following this one witness, the defense rested. ROA.439. The Government offered no rebuttal evidence and finally rested. ROA.439. The defense did not make a Motion for Judgment of Acquittal under Fed. R. Crim. P. 29 at the close of all evidence.

After closing arguments, the jury retired to deliberate. During deliberations, the jury sent a note to the court and asked "And did the government need to prove that the defendant knew the ammunition crossed state lines?" ROA.479-80. The government cited to *Rehaif v. United States*, 588 U.S. 225, 139 S. Ct. 2191 (2019) for the proposition that the government is "not required to establish a link between the defendant and interstate commerce." ROA.480. Defense counsel argued that the jury was "charged on the law" and could not receive additional instructions. ROA.480. The trial court agreed with the government and told the jury that the answer to their question was "no." ROA.481.

After deliberating further, the jury found Mr. McKay guilty of one count of felon in possession of ammunition. ROA.484. At sentencing, the Court imposed 180 months of incarceration. ROA.107-113.

### B. Relevant Procedural History.

Korea McKay was indicted on one count of knowingly possessing ammunition as a convicted felon pursuant to 18 U.S.C. § 922(g)(1). ROA.12-13. He pled not guilty. ROA.18. Mr. McKay's counsel filed five continuance motions. ROA.36, 40, 50, 56, 69. He did not file any pre-trial motions. On January 8, 2025, the Government filed a Motion in Limine asking the Court to make a preliminary determination that the foundational prerequisites had been met for admission of Mr. McKay's cell phone records and sought to introduce the records without calling live witnesses. ROA.60. Mr. McKay's counsel did not respond, and the Court granted the Government's motion. ROA.77.

Mr. McKay's trial began March 24, 2025. The government presented twelve witnesses. ROA.122, 235. The defense presented one witness. ROA.422. Defense counsel did not move for Judgment of Acquittal at any time. After deliberation, the jury found Mr. McKay guilty. ROA.484. He was sentenced to serve 180 months. ROA.107-113. On September 10, 2025, Mr. McKay timely filed his Notice of Appeal. ROA.115.

## SUMMARY OF THE ARGUMENT

Mr. McKay was indicted for and convicted of being a felon in possession of ammunition. Specifically, he was charged with possessing two shell casings recovered from the scene of a shooting where a man died. The killing of the man is

being prosecuted in a state court murder case. But Mr. McKay faced trial and now fifteen years of imprisonment for possession of a single shell casing that was at some unknown time manufactured in a state other than Mississippi. The sole basis for federal jurisdiction over this case is the Commerce Clause. While prior precedent forecloses McKay's argument that the jurisdictional basis exceeds Congress's power, this Court should reexamine that precedent in light of modern Commerce Clause holdings from the Supreme Court, which are more restrictive on federal police power.

Additionally, the prosecutor's closing arguments were, in multiple respects, not based on facts in evidence and highly prejudicial. This improper argument constituted plain error, as these remarks affected Mr. McKay's substantial rights. Alternatively, trial counsel was ineffective for failing to object to the multiple instances of improper argument.

## STANDARD OF REVIEW

Plain error review applies "if the defendant does not preserve a claim of procedural error or substantive unreasonableness in the district court." *United States v. Sepulveda*, 64 F.4th 700, 709 (5th Cir. 2023). To prevail on a claim of plain error, "the defendant must show '(1) an error or defect that is (2) plain or obvious and that (3) affected his substantial rights.'" *United States v. Wilson*, 143 F.4th 647, 660 (5th Cir. 2025). If he succeeds, the Court may exercise its discretion

to correct the error but should only do so if the error "seriously affects the fairness, integrity[,] or public reputation of judicial proceedings." *Id.* at 661 (quoting *Puckett v. United States*, 556 U.S. 129, 135, 129 S. Ct. 1423, 173 L. Ed. 2d 266 (2009)).

## ARGUMENT

### I. The Commerce Clause Does Not Support Broad National Police Powers and Federal Jurisdiction Over McKay's Conduct

McKay raises this issue for the first time on appeal, and this Court therefore reviews for plain error. *United States v. Toure*, 965 F.3d 393, 399 (5th Cir. 2020); *see* Fed. R. Crim. P. 52(b). To prevail, McKay must show an error that is clear or obvious and affects his substantial rights. *Puckett v. United States*, 556 U.S. 129, 135 (2009). McKay acknowledges that this Court has previously rejected this Commerce Clause-based argument. *See, e.g., United States v. Seekins*, No. 21-10556, 2022 U.S. App. LEXIS 23746 (5th Cir. Aug. 24, 2022) (unpublished) (summarizing precedent). McKay raises it here for reexamination by this Court or further review by the Supreme Court.

Article I, Section 8 of the United States Constitution provides: "Congress shall have power" to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." The use of the Commerce Clause as the jurisdictional basis for various criminal offenses under 18 U.S.C. § 922 has been and remains the subject of great controversy.

In *Scarborough v. United States*, 431 U.S.563 (1977), the United States Supreme Court held, as a matter of statutory interpretation, that the government could satisfy the interstate commerce element of Section 922(g)'s predecessor, 18 U.S.C. § 1201(a) (repealed 1986), by proving that a firearm had traveled across state lines at any prior point, even if the defendant's possession occurred all in one state.

Eighteen years later, in *United States v. Lopez*, 514 U.S. 549 (1995), the Court struck down a statute that made it a federal crime "for any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone," 18 U.S.C. § 922(q)(1)(A), reasoning that the law violated the Commerce Clause because it "neither regulate[d] a commercial activity nor contain[ed] a requirement that the possession be connected in any way to interstate commerce." 514 U.S. at 551.

*Lopez* clarified that, for a law that regulates neither the channels nor the instrumentalities of commerce to nevertheless comport with the Commerce Clause, the regulated activity must "substantially affect" interstate commerce. *Id.* at 559. Section 922(q) failed that test because there was no evidence that the intrastate, noncommercial act of possessing a gun in close proximity to a school had the requisite "substantial" impact on interstate economic activity, and the statute "contain[ed] no jurisdictional element which would ensure, through case-by-case

inquiry, that the firearm possession in question affect[ed] interstate commerce." *Id.* at 561.

In *Lopez*, the Supreme Court found that "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.* at 559. The *Lopez* decision appeared to, but did not expressly, overrule the more permissive "minimal nexus" test for federal regulation of gun possession articulated in *Scarborough*. *Cf. United States v. Seekins*, 52 F.4th 988, 991 (5th Cir. 2022) (Ho, J., dissenting from denial of rehearing en banc) (suggesting the holding in *Scarborough* was statutory, and not constitutional).

Members of the Supreme Court and this Court have noted that *Lopez* and *Scarborough* are irreconcilable. *See Alderman v. United States*, 131 S. Ct. 700, 702 (2011) (Thomas, J., dissenting from denial of certiorari) ("*Scarborough*, as the lower courts have read it, cannot be reconciled with *Lopez*."); *Seekins*, 52 F.4th at 991-92 (Ho, J., dissenting) (citing cases); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting) ("[T]he precise holding in *Scarborough* is in fundamental and irreconcilable conflict with the rationale of [*Lopez*].").

In his dissent in *Alderman*, Justice Thomas observed that "*Scarborough*, as the lower courts have read it, cannot be reconciled with *Lopez* because it reduces the constitutional analysis to the mere identification of a jurisdictional hook" that, like Section 922(g)'s jurisdictional element, "seems to permit Congress to regulate

or ban possession of any item that has ever been offered for sale or crossed state lines." *Alderman v. United States*, 131 S. Ct. 700, 702-03 (2011) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari). That result, Justice Thomas explained, is not only inconsistent with the *Lopez* framework but "could very well remove any limit on the commerce power" if taken to its logical extension. *Id.* at 703.

Section 922(g)(1) is a frequently used federal criminal statute. Yet, as Justice Thomas has observed, and as many lower-court judges have echoed (*see* infra), the degree of proof needed to convict under that statute is in serious tension with the Supreme Court's modern understanding of the limited nature and scope of the federal power to regulate noneconomic, intrastate activity.

The low level of proof required to demonstrate an interstate nexus is apparent in this case involving possession of ammunition. McKay was indicted for possession of **two** shell casings found at the scene of a killing that is subject to an ongoing state court prosecution of Mr. McKay for murder. ROA.12-13; ROA.355, ROA.493-94.

A prosecution witness testified that one of those shell casings was manufactured in either Arizona or Wisconsin, and not Mississippi. ROA.318. As to the other shell casing, the trial court eventually barred testimony of the purported state of origin (the manufacturer of that ammunition has facilities both inside and

outside of Mississippi). ROA.318-323. During its deliberations, the jury asked if the Government had to prove McKay knew the ammunition crossed state lines (ROA.479-80), and the Court's simple response was "no". ROA.481. On that slight factual basis, a local murder case was elevated to a federal felony for which a 15 year sentence was imposed. ROA.107-113.

Despite similarly perceiving *Scarborough* as in fundamental and irreconcilable conflict *with* Lopez, the prevailing view of the various courts of appeals is that *Scarborough* implicitly assumed the constitutionality of § 922(g)'s predecessor statute, and that "[a]ny doctrinal inconsistency between *Scarborough* and [this] Court's more recent decisions is not for [the lower courts] to remedy." *United States v. Alderman*, 565 F.3d 641, 645 (9th Cir. 2009); *United States v. Patton*, 451 F.3d 615, 636 (10th Cir. 2006); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (DeMoss, J., dissenting); *see also United States v. Kirk*, 1997 U.S. App. LEXIS 12670 n.27 (5th Cir. 1997) (en banc) (Jones, J., for half of the equally divided court) ("not[ing] the tension between" *Scarborough* and *Lopez* but observing that the Fifth Circuit has felt constrained to nevertheless "continue to enforce § 922(g)(1)" because a court of appeals is "not at liberty to question the Supreme Court's approval of [Section 922(g)'s] predecessor statute").

Despite decades of tension, the Supreme Court has not yet addressed the precise impact of *Lopez* on *Scarborough*. *See United States v. Hill*, 927 F.3d 188,

215 n.10 (4th Cir. 2019) (Agee, J., dissenting) ("While some tension exists between *Scarborough* and the Supreme Court's decision in *Lopez*, the Supreme Court has not granted certiorari on a case that would provide further guidance"). Lacking clear guidance, courts after *Scarborough* have continued to hold that § 922(g)(1)'s nexus element can be satisfied if the firearm or ammunition traveled—at any point—across a state boundary. *See, e.g., United States v. Rawls*, 85 F.3d 240, 243 (5th Cir. 1996).

This minimal nexus requirement in *Scarborough* does not satisfy *Lopez* and other modern Commerce Clause analyses. Mere ammunition possession—the crime for which McKay was convicted—involves entirely local, non-commercial activity. It does not involve participation in any cognizable market. *See Rawls*, 85 F.3d at 243 (Garwood, J., concurring) ("[O]ne might well wonder how it could be rationally concluded that mere possession of a firearm in any meaningful way concerns interstate commerce simply because the firearm had, perhaps decades previously before the charged possessor was even born, fortuitously traveled in interstate commerce"). *Scarborough*'s reading of the § 922(g)(1) nexus element is thus too broad, and it impermissibly extends federal power over purely local activity.

In *Seekins*, Judge Ho, dissenting from the court's denial of rehearing en banc, warned of the overreach of the Commerce Clause as it relates to § 922(g), lamenting that:

> For too long, our circuit precedent has allowed the federal government to assume all but plenary power over our nation. In particular, our circuit precedent licenses the federal government to regulate the mere possession of virtually every physical item in our nation—even if it's undisputed that the possession of the item will have zero impact on any other state in the union. The federal government just has to demonstrate that the item once traveled across state lines at some point in its lifetime, no matter how distant or remote in time.
>
> *That is no limit at all.* If the only thing limiting federal power is our ability to document (or merely speculate about) the provenance of a particular item, the Founders' assurance of a limited national government is nothing more than a parchment promise.

52 F.4th at 989 (Ho, J., dissenting) (citation omitted).

Much like the circumstances Judge Ho complained of in *Seekins*, in this case, there was no evidence that McKay's possession of ammunition had any impact on any other state. There was no record evidence of any commercial transaction of any kind or that the ammunition traveled across state lines at any particular moment in time. *See id.* at 990. Current precedent fails to recognize that "[t]here must be *some* limit on federal power under the Commerce Clause" and in the context of § 922(g) the current state of the law "allows the federal government to regulate any item so long as it was manufactured out-of-state—without any regard to when, why, or by whom the item was transported across state lines." *Id.*

(emphasis in original). This allows the federal government to regulate "virtually every tangible item anywhere in the United States"; "it's hard to imagine any physical item that has not traveled across state lines at *some* point in its existence, either in whole or in part." *Id.*

More recently, Judge Willett has expressed reservations about the constitutional viability of Section 922(g)(1) under modern Commerce Clause jurisprudence. *See United States v. Hembree*, 2026 U.S. App. LEXIS 2051 (5th Cir. Jan. 27, 2026); *United States v. Bonner*, 159 F.4th 338, 340 (5th Cir. 2025) (Willett, J., concurring).

In *Bonner*, a conviction under Section 922(g)(1) was affirmed because circuit precedent foreclosed all avenues of relief. 159 F.4th at 340. Judge Willett wrote a concurrence—joined by Judge Duncan—that detailed the historic use of the Commerce Clause as the jurisdictional underpinning of the firearm and ammunition proscriptions found in Section 922. *Id.* at 340-43 (Willet, J., concurring). Judge Willett questioned continued reliance on *Scarbrough's* holding based on statutory construction as possibly "stray[ing] from the Supreme Court's considered interpretations of the Commerce Clause." *Id.* at 342. Judge Willett concluded by urging this Court or the Supreme Court "to take up the question" of Section 922(g)(1)'s validity under the Commerce Clause "and reexamine our precedent" under a constitutional framework.

Just last month in *Hembree*, a panel of this Court reversed a conviction under Section 922(g)(1) because the disarming felony—simple drug possession—did not comport with Second Amendment principles articulated by *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022), *United States v. Rahimi*, 602 U.S. 680, 692 (2024), and related cases. *Hembree*, 2026 U.S. App. LEXIS 2051 at *20-21. In his concurring opinion, Judge Willett summarized again historic interpretations of the Commerce Clause and concluded: "In an appropriate case, I remain open to reconsidering whether § 922(g)(1) truly falls within Congress's enumerated powers." *Hembree*, 2026 U.S. App. LEXIS 2051 at *23-25 (Willett, J., concurring).

Section 922(g)(1) should require proof of more than interstate activity at the time a firearm or ammunition was manufactured—perhaps either recent movement in interstate commerce or some commercial conduct on a defendant's part. In the absence of such a connection to interstate commerce, the statute exceeds Congress's power under the Commerce Clause. While recognizing this Court's prior precedent rejecting this argument, McKay requests that this Court revisit that precedent or render a ruling that will permit further review.

Section 922(g)(1) is also unconstitutional as applied to McKay. McKay's indictment did not state his possession of the relevant firearm was an economic activity. ROA.12-13. Nor did it allege that he was engaged in the relevant market

at the time of the regulated conduct. ROA.12-13. The sole act to establish a factual basis for this element of the offense was that one shell casing was said to have been manufactured outside of Mississippi at an unspecified time. ROA.318. The ATF agent who testified as to the interstate nexus explained to the jury: "In order for us to get involved in a firearms-related case, we need to have interstate commerce; there needs to be an interstate nexus to the crime. It needs to affect more than one state." ROA.315

The jury instruction on the nexus element required that the jury only find "[t]hat the ammunition possessed traveled in interstate commerce; that is, before the defendant possessed the ammunition, it had traveled at some time from one state to another." ROA.92. The Government offered no proof that McKay traveled in interstate commerce to bring the ammunition to Mississippi or even that he purchased the ammunition from a seller participating in interstate commerce.

The Commerce Clause power "must be read carefully to avoid creating a general federal authority akin to the police power." *NFIB v. Sebelius*, 567 U.S. 519, 536 (2012); *see also Alderman*, 131 S. Ct. at 703 (Thomas, J., dissenting) ("[P]ermit[ting] Congress to regulate or ban possession of any item that has ever been offered for sale or crossed state lines" would be "[s]uch an expansion of federal authority" as to "trespass on state police powers.").

To find that § 922(g)(1) does not constitute Congressional overreach under the Commerce Clause supports a view that it is enough to confer federal jurisdiction "that some object (or component of an object) at some unknown (and perhaps unknowable) point in time traveled across state lines"; it is therefore "hard to imagine anything that would remain outside the federal government's commerce power." *Seekins*, 52 F.4th at 990 (Ho, J., dissenting). "There is no plausible reading of the Commerce Clause, as originally understood by our Founders, that could possibly give the federal government such reach." *Id.* (citations omitted). Accordingly, this Court should reverse and render McKay's conviction because § 922(g)(1) is an unconstitutional extension of Congress's authority under the Commerce Clause.

Although thus far this Court has adhered to the view that *Scarborough*'s "minimal nexus" is sufficient both to prove guilt under the statute and to bring any subsequent act of possession within Congress's power to regulate, *see generally United States v. Alcantar*, 733 F.3d 143, 145–46 (5th Cir. 2013), McKay urges this Court to hold that § 922(g)'s possession prong, as commonly understood and applied, exceeds Congress's enumerated powers.

The error here is plain because it affects McKay's substantial rights. Without the interstate nexus at issue McKay would not have been indicted and found guilty in federal court and the result of his proceedings would thus obviously be different

absent any error. Moreover, the error has a serious effect on the fairness, integrity, and public reputation of proceedings because it requires McKay to serve a lengthy prison sentence for violating a statute that cannot be constitutionally applied to him. *See Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016); *see also United States v. Urbina-Fuentes*, 900 F.3d 687, 698 (5th Cir. 2018).

For all of these reasons, this Court should reverse and render McKay's conviction under Section 922(g)(1).

## II. The Prosecution Made Improper Closing Arguments

During closing, the government presented improper closing argument. To begin, the government narrated the moments before the shooting, stating:

> [Mr. Thomas] sees that [] brownish truck is down the road from that apartment; and he goes up, 'Don't yell at these kids. Don't come flying through here.' And [Mr. Thomas] hears, 'Who are you?' So he walks up to that truck. You see that on the video. He says, "I'm Vao"; and he's met with gunshots. The driver of that truck immediately shot him. He said, 'This is my hood.'

ROA.451. Later, the government repeats this assertion in closing: "It was Korea McKay. 'This is my hood.' That's the real Korea McKay." ROA.476.

The Government then says:

> Who has power – more power than the police in that neighborhood is this man. Witnesses don't want to come forward and provide videos to the police. They don't want to come testify. You know who can get videos from the neighbors? Korea McKay. Korea McKay can.
>
> And I don't know if it came across, but the video came from the defendant. We heard the testimony of the police investigators. They

> wanted to get the videos that were being disseminated from the neighbors. They had the door slammed in their face. No one would talk to them. This is real.

ROA.477.

In addition, the government stated that "[the defense] **still can't explain** why the truck is hidden and the tag's removed. Why? Why? Why park it in the middle of a field behind a trailer and take the license plate off?" ROA.475.

These arguments were improper and not rooted in the evidence presented at trial and warrant reversing Mr. McKay's conviction.

"[A] prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence." *United States v. Ceballos*, 789 F.3d 607, 624 (5th Cir. 2015) (quoting *United States v. Reagan*, 725 F.3d 471, 492 (5th Cir. 2013)). Moreover, this Court has "repeatedly chastised federal prosecutors for making improper remarks in closing arguments—for example, . . . attacking the character of the defendant[.]" *United States v. Bowen*, 818 F.3d 179, 191 (5th Cir. 2016) (quoting *United States v. Rodriguez-Lopez*, 756 F.3d 422, 433-34 (5th Cir. 2014)). *See also Berger v. United States*, 295 U.S. 78, 88 (1935) (explaining that a prosecutor "may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to

refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.”).

The inquiry on review is "whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict[]" which consider "(1) the magnitude of the prejudicial effect of the prosecutor's remarks, (2) the efficacy of any cautionary instruction by the judge, and (3) the strength of the evidence supporting the conviction." *Ceballos*, 789 F.3d at 624 (quoting *United States v. Thompson*, 482 F.3d 781, 785 (5th Cir. 2007)).

The government’s allusion to the comment “This is my hood” seems to refer to Kinnell’s testimony on direct examination. She testified that

> [Mr. Thomas] went up - - the conversation they was having, they were going back and forth. And he was telling the kids - - mister - - whoever was driving, they was, like, “You ain’t got to tell them to get out the road. This my hood.”

ROA.170.

Ms. Kinnel’s testimony was that Mr. Thomas said that Kirby Estates was his “hood” – not Mr. McKay. Mr. Thomas lived in Kirby Estates. ROA.150. Mr. McKay did not. ROA.225. According to Kinnell, Mr. Thomas was responding to the driver’s aspersions by saying that he (Mr. Thomas) lived there and had the authority to direct kids where to play and the driver did not.

The Government attributed this statement to Mr. McKay on multiple occasions, and this incorrect factual argument served as the basis for continuing to

attack Mr. McKay's character throughout closing. *Bowen*, 818 F.3d at 191. The government also stated that Mr. McKay had "more power than the police in that neighborhood" without providing any explanation as to how they arrived at this conclusion. ROA.477. The government then suggested that Mr. McKay wielded this "power" to influence witnesses refusing to cooperate with police and not testifying in the trial. ROA.477.

It is not uncommon for potential witnesses to choose not to speak with law enforcement officers and suggesting that Mr. McKay orchestrated a plan to keep multiple witnesses from testifying or cooperating is rife with speculation and conjecture. This conclusion had no evidentiary basis in the record and did little more than inflame and impassion the jury. *See Ceballos*, 789 F.3d at 624.

Additionally, the government improperly shifted the burden to McKay by saying that "Korea McKay can. . . get the videos from the neighbors" and that he could not "explain why the truck is hidden". ROA.475, 477. It is not Mr. McKay's burden to prove his innocence but the government's burden to prove his guilt. *See Jackson v. Virginia*, 443 U.S. 307 (1979). Thus, the government improperly commented on Mr. McKay's failure to prove something, when it clearly is not his burden to prove anything.

The government twice used the "This is my hood" statement and suggested that he had "more power than the police" to show the jury "the real Korea

McKay." ROA.451, 476-77. This was a repeated theme and not simply "an isolated statement." *See United States v. Hitt*, 473 F.3d 146, 161 (5th Cir. 2006). This theme improperly "attack[ed] the character of" Mr. McKay and had no evidentiary basis. *Bowen*, 818 F.3d at 191. These are not "reasonable inferences or conclusions that can be drawn from that evidence" and as such, the government went outside the "confine[s]" of the proof presented at trial to do so. *Ceballos*, 789 F.3d at 624.

The effect of the government's improperly painted picture of Mr. McKay was one of great magnitude, and there was no cautionary instruction provided to cure the improper argument. *Id*. While Mr. McKay meets the first two elements, this Court must still consider the strength of the evidence supporting the conviction. *Id*.

The case against Mr. McKay was by no means strong. No witness saw Mr. McKay driving the truck or firing a shot. There was no DNA evidence tying him to the crime. Evidence at trial showed that Kirby Estates was the site of many shootings. And multiple people had access to the scene before it was secured. The jury deliberated for over two hours and asked two questions. ROA.479-83. The circumstantial nature of the proof, coupled with the prosecutor's remarks and the lack of a curative instruction "cast serious doubt on the correctness of the jury's verdict." *Ceballos*, 789 F.3d at 624.

Mr. McKay acknowledges that his trial attorney failed to object to the government's closing arguments; thus, this Court must review his appellate argument under the plain error standard. *See Sepulveda*, 64 F.4th at 709. However, this Court has "**repeatedly** chastised federal prosecutors for. . . attacking the character of the defendant[.]" *Bowen*, 818 F.3d at 191 (emphasis added). Thus, the prosecutor's closing remarks are an "(1) error or defect that is (2) plain or obvious" because this Court has had to "repeatedly" admonish prosecutors for this exact conduct. *Wilson*, 143 F.4th at 660. This, coupled with the "repeated theme" characterizing Mr. McKay as someone with "more power than the police" affected his substantial right to a fair trial. These inflammatory arguments invited the jury to punish Mr. McKay for what he *might* have done or who they *thought* he was and not the offense for which he was on trial: felon in possession of ammunition. This Court has discretion to proceed under plain error review and should find that these errors "affected his substantial rights." *Wilson*, 143 F.4th at 660. Accordingly, his conviction should be reversed.

Alternatively, this Court should find that trial counsel was ineffective for failing to object to the improper closing argument.[5] If the Court does not find plain error on this ground, McKay can meet both prongs of showing ineffective

[5] This alternative argument is made out of an abundance of caution, so as not to waive the argument. If the Court believes that this alternative argument is better raised in a 28 U.S.C. § 2255 petition, McKay requests that this part of this ground be ruled upon without prejudice to raise it in a post-conviction proceeding, if necessary.

assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). *See, e.g., Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000) (finding deficient performance of trial counsel for failure to object to prosecutorial misconduct).

## CONCLUSION

For the reasons set forth herein, Korea McKay respectfully requests that this Court REVERSE and RENDER his conviction for felon in possession of ammunition. Alternatively, McKay requests that the Court REVERSE and REMAND the matter for further proceedings.

RESPECTFULLY SUBMITTED, this the 18th day of February, 2026, by

**KOREA MCKAY,**
**THROUGH HIS ATTORNEY**

*/s Graham P. Carner*
GRAHAM P. CARNER
Miss. Bar No. 101523
CARNER & ROSEMON, PLLC
401 East Capitol Street, Suite 310
Jackson, Miss. 39201
graham@carnerrosemon.com

CERTIFICATE OF SERVICE

I, Graham P. Carner, certify that in accordance with Fifth Circuit Rule 25.2.1 this document was filed electronically with the Fifth Circuit ECF system on February 18, 2026.

I further certify that filing via the ECF system in this fashion satisfies my duty to serve all other counsel, who consent to such service via their registration in ECF and pursuant to Fifth Circuit Rule 25.2.3 and 25.2.5.

*/s Graham P. Carner*
Graham P. Carner
*Attorney for Defendant-Appellee*

February 18, 2026

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of FRAP 32(a)(7)(B) limiting a principal brief to 13,000 words because it contains **7,291 words**, including footnotes, excluding the parts of the brief exempted by FRAP 32(f).

2. Further, this brief complies with the typeface requirements of FRAP 32(a)(5) and the type style requirements of FRAP 32(a)(6) and Fifth Circuit Rule 32.1 because the brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010, in Times New Roman font, at 14 point size for the main text, and 12 point size for footnote text.

*/s Graham P. Carner*
Graham P. Carner
*Attorney for Petitioner-Appellant*

February 18, 2026